### 305

| Frank R. Vigneau | W. C. A. |
| vs. | |
| Joseph Benn & Sons, Inc. | No. 216 |

### RESCRIPT

March 26, 1919

BARROWS, J. Heard on petition for compensation for death of petitioner's wife, an employee in respondent's mill at Greystone. She left work because of illness on August 15, 1917. She died September 2, 1917, from typhoid fever.

Respondent claims (1) that no notice of the alleged accident was given as required by statute; (2) that petitioner is not a dependent entitled to compensation; (3) that typhoid fever contracted as petitioner alleges was not a personal injury by accident arising out of and in the course of deceased's employment; (4) that the typhoid fever with which deceased was afflicted was not contracted as petitioner has alleged.

The first and third are questions of law. Whether typhoid fever comes within the Workmen's Compensation Law compare.

Walsh vs. River Spinning Co., 41 R. I. 490 at 492.

The second is a mixed question of law and fact.

There was no evidence whatever of dependency. The testimony showed that deceased was four months pregnant and that the petitioner is now in the United States Army. The evidence further showed that petitioner and his wife lived together from the time of

their marriage in April 1917 until the time of her reeease. It is claimed by petitioner that under such circumstances actual dependency is not necessary.

Public Laws, Chap. 831, Sec. 7 (b).

Without passing upon the question of law, it is patent that petitioner must sustain his allegations as to the source of the infection of deceased if he is to be granted compensation.

### 306

Typhoid fever was prevalent in Greystone and vicinity from May to October 1917, with a large majority of the cases in August. The total number of suspected cases, according to Dr. Richards, was 58. The known cases appear in evidence upon a chart marked Respondent's Exhibit 1. Most of these cases were among people who either lived in Greystone Village or worked in respondent's mill, often both. The earliest case was Lena La Bonte who did not live at Greystone but worked in respondent's mill. She was a chum of the Whalen girl, who was the second case early in May 1917. The latter became ill a few days after the La Bonte girl. Miss Whalen lived in Greystone Village and her house was connected with the village water supply and cesspool, to be referred to later. She testifies that it was her practice to borrow a drinking cup from her friends in the mill when she did not have her own. Other girls did the same. The evidence does not show, however, that anyone used the La Bonte girl's cup, but Miss Whalen was in the habit of washing up with Lena La Bonte at least twice daily. There was no common drinking cup furnished by the mill. The Whalen girl returned to work early in June. Shortly thereafter her mother had typhoid fever and in August, her brother. On August 2nd, four cases appear; on August 4th, two; on August 5th, five; on August 6th, three; on August 7th, one; on August 9th, 10th, 11th, and 12th, two each; on August 13th and 14h, one each; on August 15th, three; on August 19th, one; on August 21st, two; on

August 23rd, one; on August 19th, one; on August 21st, two; on August 23rd, one; on August 24th, two; on August 27th, three; and one each on five later days up to October 23rd.

Petitioner's wife worked in the curling-room of mill No. 3. She was the only girl in that room to contract the disease. About forty popele worked in that room and used the drinking water supplied therefor from the well. From the Woonasquatucket River came another supply of water into said mill for manufactural purposes. The testimony of those who appeared in court was that they never knew anyone to drink the river water instead of the drinking water. The difference was well known and easily observable. The river water was generally discolored. There was much swimming in the river during the summer of 1917. •

At the homes in some of the cases, namely, Naylor, Sykes, Berbue, Pezzi and Perisi, there were open privy vaults badly fly infested. The excreta from typhoid patients had been emptied into these vaults. These places were not in Greystone Village. They were two miles or more away. Some of the help who did not live in the village carried lunches and ate them at the mill. Detitioner's wife was one of these.

The petition states the fact of employment as follows: "Said Joseph Benn

### 307

ployment as follows: "Said Joseph Benn & Sons, Incorporated, were engaged in the manufacture of cloth and operated a mill for this purpose in said Greystone, in which a great many persons were employed; that said Anna M. Vigneau had been employed at said mill for several years past by the said Joseph Benn & Sons, Incorporated, and up to the 15th day of August, 1917, as a percher in the cloth room; that said employer during the said time of employment of said Anna M. Vigneau furnished to the persons employed in said mill in the course of their employment, including the said Anna M. Vigneau, drinking water for the use of said employees

derived from a well on said mill property and pumped from said well and distributed through said mill by pipes with faucet attached for drawing water for drinking purposes; (and also furnished another supply of water distributed through said mill by other pipes for manufactural purposes); that on the first day of August, 1917, and continuing through and up to the 15th of August, water was furnished as aforesaid in the manner aforesaid by said employer to said employees in said mill, including Anna M. Vigneau, which unintentionally, undesignedly and unexpectedy contained and was polluted with bacteria germs and bacilli, which when taken into the human system of a person by drinking would cause injury, sickness and typhoid fever; that on the said days from the 1st to the 15th of •August, 1917, the said Anna M. Vigneau, while so employed and in the course of her employment, drank said water so polluted, furnished by said employer as aforesaid."

At the close of petitioner's testimony there had been no evidence upon which to sustain the claim that the drinking water supplied by respondent to its employees from the well was infected with typhoid fever germs. Petitioner's evidence showed that the well water had been analyzed and was of excellent quality. The theory that the manufacural water was infected and got into the pipes carrying the well water, with which petitioner started, not only had failed utterly of proof, but the impossibility of such a commingling of said waters had been strongly suggested. Petitioner then asked and was given leave to amend the petition by inserting the words which appear in parenthesis above, and the case proceeded on petitioner's revised theory that deceased in some way had used river water for drinking purposes.

The evidence showed that Greystone was a village of 1500 people; that perhaps 850 worked in respondent's mill;

that just outside of Greystone were other small settlements from which came workers in said mill; that the drinking water supply of the mill and Greystone Village came from a well on respondent's premises; that this well water was used also by the employees for personal use in washing up; that there was in addition piped into the mill

308

a supply of water for manufactural purposes and washing floors, which supply, as before suggested, came from the Woonasquatucket River; that the drinking water faucet was above a wash bowl and the manufactural supply faucet was underneath such bowl and about a foot above the floor; that there is a large cesspool upon the bank of the river into which flowed all the village sewage and that into said cesspool, during the summer of 1917, came excreta and urine from houses where patients were ill with typhoid fever; that this cesspool was not far from the river bank and so built that the water from the cesspool seeped through seven feet of sand and had done so since the construction of the cesspool about 14 years ago; that this seepage could be seen in the form of a small stream six or eight inches wide and three or four inches deep.

Typhoid fever was shown to be a disease obtained from taking the typhoid bacillus into the digestive tract. The bacillus is found most frequently in excreta and urine from typhoid patients. It is sometimes found in the sputum of infected persons. It is easily carried by flies. The disease is very contagious and the period of incubation is from seven to twenty-one days, averaging about fourteen.

In view of the travel of the case above stated, petitioner's theory ultimately became that the river water probably was polluted with typhoid germs and that the deceased drank such water in the mill, thereby contracting the disease. The evidence fails to show that she ever drank river water. Assuming, for the sake of argument, however, that

she may have done so there is still no actual evidence that the river water contained germs of typhoid fever. The two witnesses who so assume, Dr. Richards, Secretary of the State Board of Health, and the Chemist of said Board, Mr. Gage, did not analyze the water in an effort to find out, though they were present on the premises of respondent on August 9th, 11th, 13th, and 16th for the purpose of tracing the origin of this particular epidemic. Mr. Gage did analyze the well water on August 9th and found no typhoid germs therein. He never analyzed the river water for typhoid germs. He says: "The finding of typhoid germs in water is a difficult task." Mr. Gage states his conclusion as follows: "We believe the infection was distributed by the drinking water supply and that the drinking water supply was polluted by some leakage on way or another from the manufactural water supply, and that being polluted with sewage might cause typhoid fever. We didn't have any authentic knowledge that the manufacturing supply was polluted by typhoid bacillus. We had chemical knowledge from our own examination that it was polluted and with sewage."

To the Court the above seems to be a

309

very natural guess, but in view of the possibilities of more definite knowledge, it does not seem sufficient as proof upon which to impose a liability upon respondent. On the other hand Professor Gorham, appearing for respondent, says that the germ of typhoid, if present, can be found in water though the process requires care. If the river was as full of typhoid germs as petitioner believes, it would seem that they could have been found. The conclusion was drawn by Dr. Richards that the typhoid cases at Greystone were water borne because that seemed the most likely source of infection. He did not claim, however, that his investigation of other causes was complete. He said he had formed an opinion that the consumption

308, 309

of the polluted water supply probably caused the disease; that this might have come from drinking river water or from drinkng well water into which river water had been taken. He admitted that he had no evidence of either and that he made no investigation of such possibility. In cross-examination he said: "The common supply was the water and as long as we found that the water was polluted, we eliminated other causes." He made no claim that he had found any typhoid germs in either water. A little later he said: "Q. You simply went out there and said, 'Well, here is a common water supply; I guess that is the answer.' Isn't that so? A. Practically, yes, sir, because as soon as the recommendations made were complied with, the thing was all over and there was nothing else to look up."

The recommendations referred to were the disconnection of the two water systems.

As above stated, the evidence was that cross-flow from the manufactural to the drinking supply system was not possible. The drinking water pressure was never below 65 pounds and the river water pressure never above 50 pounds. Both were automatically controlled and there were two pumps working alternately on the drinking water pipes. In addition to this Mr. Gage examined and found the valve between the two systems to be tight.

Professor Gorham, whose experience with and knowledge of typhoid epidemics was much greater than that of Dr. Richards or Mr. Gage, gave it as his opinion that this was not a water borne epidemic. The region is one where more or less typhoid occurs annually. This epidemic was not sufficiently explosive nor did it occur in as many cases as he would expect if it had been a water or milk borne epidemic. He believed it probable that the epidemic was started in Greystone by the La Bonte girl and the Whalen family. He says the typhoid bacillus is carried sometimes for years by people who have had the disease.

309

The chart prepared by him shows that this epidemic was not of the explosive type. He terms it a typical summer epidemic. Calling it such, "from the

310

type of the curve shown in the distribution of cases, caused perhaps by one or two cases in the neighborhood possibly developing into carriers that infect food, infect cesspools, so that flies carry the disease, possibly infect milk now and then; and also that some of the cases were. probably so called contact cases that visited patients and came into contact with them from time to time; the epidemic is strung out over such a long period without any typical peak in the curve, that it looks more like contact infection anl carrier infection than either typical water or milk epidemic."

On the above evidence we are not called upon to decide that Professor Gorham's theory is correct. For the purpose of the present case petitioner must fail unless he satisfies the Court that the deceased came to her death through water which she drank in the mill of respondent and which was furnished by respondent. The utmost that petitioner can claim to have shown is a possibility that she got typhoid fever in that way. Broad as is the compensation act and liberally as the courts have construed it, we cannot impose a liability based upon a possibility of facts agaginst which the evidence strongly preponderates. Petitioner has not shown by the evidence a reasonable probability that deceased came to her death from drinking either well or river water in respondent's mill.

The petition for compensation is therefore denied.